**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FALLEN PRODUCTIONS, INC., EVE NEVADA, LLC, MILLENNIUM FUNDING, INC., BODYGUARD PRODUCTIONS, INC., GUNFIGHTER PRODUCTIONS, LLC, VOLTAGE HOLDINGS, LLC, HB PRODUCTIONS, INC., KILLING LINK DISTRIBUTION, LLC, LHF PRODUCTIONS, INC., RAMBO V PRODUCTIONS, INC., and WONDER ONE, LLC, | Civil Action No. _____ |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| JOHN OR JANE DOE d/b/a POPCORNTIME.APP, DOES 1-100, VOXILITY, LLC, and WICKED TECHNOLOGY LIMITED d/b/a VPN.HT, | |
| Defendants. | |

## <u>COMPLAINT</u>

FALLEN PRODUCTIONS, INC., EVE NEVADA, LLC, MILLENNIUM FUNDING, INC., BODYGUARD PRODUCTIONS, INC., GUNFIGHTER PRODUCTIONS, LLC, VOLTAGE HOLDINGS, LLC, HB PRODUCTIONS, INC., KILLING LINK DISTRIBUTION, LLC, LHF PRODUCTIONS, INC., RAMBO V PRODUCTIONS, INC., and WONDER ONE, LLC ("Plaintiffs"), by and through their counsel, bring this Complaint against JOHN OR JANE DOE d/b/a POPCORNTIME.APP, DOES 1-100, WICKED TECHNOLOGY LIMITED d/b/a VPN.HT, and VOXILITY, LLC ("Defendants") and allege as follows:

20-023I

## I.   NATURE OF THE ACTION

1.      Plaintiffs bring this action under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, *et seq.* (the "Copyright Act"), and allege that Defendants JOHN OR JANE DOE d/b/a POPCORNTIME.APP ("Doe"), DOES 1-100, and WICKED TECHNOLOGY LIMITED d/b/a VPN.HT ("Wicked") are liable for direct infringements in violation of 17 U.S.C. §§ 106 and 501 and violations under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

2.      Plaintiffs further allege that Defendants Wicked and VOXILITY, LLC ("Voxility") are secondarily liable for direct infringements in violation of 17 U.S.C. §§ 106 and 501, secondarily liable for violations under DMCA, 17 U.S.C. § 1202, and liable for injunctive relief pursuant to 17 U.S.C. §§ 512(j).

## II.   JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, *et seq.*, (the Copyright Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition), and 28 U.S.C. § 1367 (supplemental jurisdiction).

4.      Defendants solicit, transact, or are doing business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.

5.      Voxility is a Virginia limited liability company and maintains two data centers in Ashburn, Virginia and a data center in Reston, Virginia, among other data centers.

6.      Wicked contracted with Voxility for hosting and network service including Internet Protocol ("IP") addresses at locations including, upon information and belief, the three data centers in Virginia and thus in this District.

7.     Doe contracted with Wicked to host its movie piracy software application "Popcorn Time" and website popcorntime.app on servers of Voxility and thus in this District.

8.     Particularly, Doe and Wicked agreed that Wicked would allow Doe to host its movie piracy software application Popcorn Time and website on servers and/or service Wicked obtained from Voxility in Virginia in exchange for Doe promoting Wicked's VPN service as a means to use Doe's Popcorn Time to pirate copyright protected content "safely and anonymously" and including a feature in Popcorn Time that allows users to easily install Wicked's VPN service.

9.     DOES 1-100 are users of Doe's piracy application Popcorn Time and Wicked's VPN service.  Particularly, DOES 1-100 use Popcorn Time to pirate copyright protected Works including Plaintiffs' "safely and anonymously" as promoted and encouraged by Wicked and Doe.

10.    In the alternative, the Court has jurisdiction over Wicked and Doe pursuant to Fed. R. Civ. P. 4(k)(2), the so-called federal long-arm statute, for at least the following reasons: (1) Plaintiffs' claims arise under federal law; (2) Wicked and Doe purposely direct their electronic activity into the United States and target and attract a substantial number of users in the United States and, more particularly, this District; (3) Wicked and Doe do so with the manifest intent of engaging in business or other interactions with the United States; (4) Wicked and Doe are not subject to jurisdiction in any state's courts of general jurisdiction; and (5) exercising jurisdiction is consistent with the United States Constitution and laws.

11.    Wicked and Doe use or have used many United States ("US") based sources for operating their interactive websites and services.  Wicked and Doe use or have used the nameserver company Cloudflare, Inc. (California) and the email service of the US Company Google (California) for his websites.

20-023I

12.     Wicked and Doe agreed to be subject to jurisdiction in the US and to a Court in the US (California) when agreeing to terms of services with Cloudflare for nameserver service and Google for email service.

13.     Wicked attempts to purposely avail itself of the advantages of US law.  Particularly, Wicked takes advantage of the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA") on its website by reference to the United States Code.

14.     Wicked and Doe use US social media platforms such as TWITTER and FACEBOOK to promote their services to US consumers.

15.     Doe promotes overwhelmingly the availability of US movies to pirate on its website.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents resides and/or can be found in this District.

### III.     PARTIES

#### A.   The Plaintiffs

17.     The Plaintiffs are owners of the copyrights for the motion pictures (hereafter: "Works"), respectively, as shown in Exhibit "1".

18.     Plaintiffs Fallen Productions, Inc., Millennium Funding, Inc., Bodyguard Productions, Inc., HB Productions, Inc., LHF Productions Inc., and Rambo V Productions, Inc. are corporations organized and existing under the laws of the State of Nevada, have principal

4

offices in Los Angeles, California, and are affiliates of Millennium Media, a production company and distributor of a notable catalog of major motion pictures.

19.     Plaintiffs Eve Nevada, LLC, Gunfighter Productions, LLC, Voltage Holdings, LLC, and Wonder One, LLC are limited liability companies registered under the laws of the State of Nevada, have principal offices in Los Angeles, California and are affiliates of Voltage Pictures, a production company with a notable catalog of major award-winning motion pictures.

20.     Killing Link Distribution, Inc. ("Killing Link") is a limited liability company organized under the laws of California and having its principal office in California, and is an affiliate of CineTel Films, a production company with a notable catalog of major award-winning motion pictures.  *See* http://www.cinetelfilms.com/.

21.     Plaintiffs are producers of popular motion pictures currently available for sale in online and brick and mortar retail stores. Many of these critically acclaimed motion pictures were released in theaters throughout the world and feature A-list actors such as Matthew McConaughey, Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, and Angela Basset, among others.

22.     Plaintiffs invested significant financial resources, time and effort in making and marketing these motion pictures based upon the expectation that they would have an opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures on the Internet via peer to peer ("P2P") networks by customers of Internet Service providers ("ISPs") and data centers such as Voxility and Wicked and the willful failure of the ISPs to deal with this issue despite clear notice of it have hindered this opportunity.

**B.  The Defendants**

23.     Defendant Voxility is a limited liability company organized under the laws of Virginia with its principal place of operations in San Francisco, California.

24.     Upon information and belief, Voxility has been in existence since 2004.

25.     Voxility operates datacenters and provides Internet and hosting services.  Voxility provides IP addresses, Internet access, dedicated servers and co-location to its customers.

26.     Wicked is a limited company organized under the laws of Hong Kong Special Administrative Region of the People's Republic of China.

27.     Upon information and belief, the principal place of operation of Wicked is Sheung Wan, Hong Kong.

28.     Wicked is a provider of Virtual Private Network ("VPN") services under the name VPN.HT from, upon information and belief, 2015.

29.     Wicked's VPN service is for transmitting, routing, and/or or providing connections for said transmitting and routing, through a network controlled by Wicked and Voxility ("providing network connections").

30.     A VPN is a type of Internet Service that provides access to the Internet. A conventional ISP will assign its subscriber an IP address and log the subscriber's activities on the Internet while using the assigned IP address.  In comparison, many VPN providers provide their subscribers "anonymous" usage by, for example, not logging subscriber access, assigning the subscriber IP addresses that are simultaneously shared among many users, and/or encrypting traffic.

31.     Wicked advertises its VPN service under the brand name "Popcorn Time VPN" and promotes it as a tool that can be used to pirate copyright protected content without "getting into trouble."

32.     Doe is a group of individuals that operate the notorious BitTorrent Client software application referred to as "Popcorn Time" currently available at the website popcorntime.app that is designed and used overwhelmingly for movie piracy.

20-023I

33.     DOES 1-100 are subscribers of the Wicked's VPN service and users of Doe's Popcorn Time.  Each of DOES 1-100 were assigned an IP address from the Wicked VPN service and used said IP address to download and reproduce Plaintiffs' Works without a license and further share (distribute) copies of Plaintiffs' Works from said IP address to individuals across the world as encouraged and instructed to by Wicked and Doe.

34.     Each of Defendants DOES 1-100 used Popcorn Time to obtain torrent files for downloading and distributing Plaintiffs' Works while assigned an IP address provide by Wicked.

35.     Defendants DOES 1-100 are members of a group of BitTorrent users or peers whose computers are collectively interconnected for the sharing of a particular unique file, otherwise known as a "swarm".  The particular file a BitTorrent swarm is associated with has a unique "hash" number and a file name.

36.     Plaintiffs are informed and believe that Wicked is in possession of identification information or information that will lead to the identities of Doe d/b/a popcorntime.app and DOES 1-100 such as payment information. However, further discovery may be necessary in some circumstances in order to be certain of the identity of the proper Defendant. Plaintiffs believe that information obtained in discovery will lead to the identification of each of Defendants Doe and DOES 1-100's true names and permit the Plaintiffs to amend this Complaint to state the same. Plaintiffs further believe that the information obtained in discovery may lead to the identification of additional infringing parties to be added to this Complaint as defendants.  Plaintiffs will amend this Complaint to include the proper names and capacities when they have been determined. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously-named Defendants participated in and are responsible for the acts described in this Complaint and damages resulting therefrom.

20-023I

### C. Non-parties

37.     The American Registry of Internet Numbers ("ARIN") is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers (ASNs).

38.     Member of ARIN such as Voxility are required to agree to terms of a registration agreement.

## IV.     JOINDER

39.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely subscribers of Voxility of such as Wicked and of Wicked (such as Defendants DOES 1-100) using Wicked's VPN service and Doe's Popcorn Time application for infringing the copyrights in Plaintiffs' Works, the contribution to said infringements by Voxility, and the promotion of the VPN by Wicked for the purpose of infringing copyright protected Works including Plaintiffs'; and (b) that there are common questions of law and fact.

40.     Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants are properly joined because, as set forth in more detail below, Plaintiffs assert that the infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.  That is, each of Defendants DOES 1-100 used the VPN service provided by Voxility and Wicked and promoted by Wicked and Doe to infringe Plaintiffs' copyrights in their Works.

20-023I

## V.       FACTUAL BACKGROUND

### A. The Plaintiffs Own the Copyrights to the Works

41.     The Plaintiffs are the owners of the copyright in the Works, respectively.   The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.  *See* Exhibit "1".

42.     Each of the Works are motion pictures currently offered for sale in commerce.

43.     Defendants had notice of Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

44.     Defendants also had notice of Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

### B. Defendants DOES 1-100 Used BitTorrent to Infringe the Plaintiffs' Copyrights

45.     BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

46.     The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

20-023I

**1. Each of Defendants DOES 1-100 installed Doe's BitTorrent Client Popcorn Time onto his or her Computer.**

47.     A BitTorrent Client is a software program that implements the BitTorrent Protocol. There are numerous such software programs which can be directly downloaded from the Internet.

48.     Once installed on a computer, the BitTorrent Client serves as the user's interface during the process of uploading and downloading data using the BitTorrent protocol.

49.     Defendants DOES 1-100 installed Doe's BitTorrent Client Popcorn Time onto their respective computers.

50.     Popcorn Time has been referred to in the news media as "Netflix for pirates". http://fortune.com/2016/02/26/popcorn-time-netflix-pirates/ [accessed on March 1, 2021].

51.     Popcorn Time is so notorious that the United States Trade Representative ("USTR") placed it on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. *See* USTR, 2020 Review of Notorious Markets, Jan. 14, 2021, pg. 26, available at https://ustr.gov/sites/default/files/files/Press/Releases/2020%20Review%20of%20Notorious%20Markets%20for%20Counterfeiting%20and%20Piracy%20(final).pdf [last accessed on March 5, 2021].

52.     Popcorn Time provides an interface so that users can easily copy and share copies of copyright protected content, including Plaintiffs'.

53.     The home interface of Popcorn Time includes a collection of title art of popular motion pictures and a search bar where a user can enter words associated with a copyright protected motion picture he or she wishes to pirate.

20-023I

54.     Simply entering words associated with a motion picture automatically generates a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words.

### 2. The Initial Seed, Torrent, Hash and Tracker

55.     A BitTorrent user who wants to upload a new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using the Client he or she installed onto his or her computer.

56.     The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

57.     The initial seeder often modifies the file title of the Work to include a wording such as "RARBG", "FGT" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her files and attract users to his or her piracy website.

58.     The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

59.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Work, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

60.     When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

61.     Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing suggested names for the files,

their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

62.     The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

63.     The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Works, on them and facilitates the exchange of data among the computers.

64.     Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 3. Torrent Sites

65.     "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol. There are numerous torrent websites such as the YTS website, The Pirate Bay, Kickass Torrents, and Extratorrents.

66.     Upon information and belief, Defendants DOES 1-100 went to the torrent site directly or indirectly via Popcorn Time to download Plaintiffs' copyrighted Works.

67.     By using a BitTorrent Client such as Popcorn Time, Defendants DOES 1-100 can simply enter words associated with a motion picture to automatically generate a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words and chose one particular motion picture and automatically connect to torrent sites.

### 4. Uploading and Downloading a Work Through a BitTorrent Swarm

68.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked

(here the copyrighted Works) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

69.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.

70.     Once a peer receives a piece of the computer file, here a piece of one of the copyrighted Works, it starts transmitting that piece to the other peers.

71.     In this way, all of the peers and seeders are working together in what is called a "swarm."

72.     Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

### 5. The Plaintiffs' Computer Investigator Identified IP Addresses as Participants in a Swarm That Was Distributing the Plaintiffs' Copyrighted Works

73.     The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiffs' copyrighted Works.

74.     MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

75.     MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

20-023I

76.     The IP addresses, Unique Hash Number, and hit dates accurately reflect what is contained in the evidence logs, and show that Defendants DOES 1-100 have copied a piece of the Plaintiffs' copyrighted Works as identified by the Unique Hash Number from, for example, IP addresses 104.152.44.26 and 104.152.44.18.

77.     The Defendants DOES 1-100's computers used the identified IP addresses to connect to the investigative server from a computer in this District in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

78.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses and verified that re-assemblage of the pieces using a BitTorrent Client results in fully-playable digital motion pictures of the Works.

79.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

***C. Defendants DOES 1-100 knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.***

80.     A legitimate file copy of the Works includes copyright management information ("CMI") indicating the title.

81.     The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles of the Works to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

82.     The initial seeder of the infringing file copies of the Works added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS piracy website.

83.     The word YTS is not included in the file title of legitimate copies or streams of the Plaintiff's Works.  The initial seeder of the Works altered the title to falsely include the words "YTS" in the CMI.

84.     The file copies Defendants DOES 1-100 distributed to other peers in the Swarm included the altered CMI in the file title.

85.     Defendants Doe and DOES 1-100 knew that the website or BitTorrent Client from which they obtained their torrent files was distributing illegal copies of the Works.

86.     Defendants Doe and DOES 1-100 knew that YTS was not the author of Plaintiffs' Works.

87.     Defendants Wicked, Doe and DOES 1-100 knew that YTS was not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

88.     Defendants Wicked, Doe and DOES 1-100 knew that the CMI that included YTS in the file names was false.

89.     Defendants Wicked, Doe and DOES 1-100 knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI, or the Works including the false or altered CMI.

90.     Namely, Wicked, Defendants Doe and DOES 1-100 knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Works.

91.     Indeed, Wicked promotes its VPN service as a tool to pirate copyright protected content from the YTS website.

92.     By providing the altered CMI to others via Popcorn Time, Defendant Doe induced, enabled, and facilitated further infringements of the Works

93.     By providing the altered CMI to others, Defendants DOES 1-100 induced, enabled, and facilitated further infringements of the Works.

**D.   Voxility had knowledge that its subscriber Wicked was promoting and infringing Plaintiffs' Works and distributing file copies of the Works with altered CMI but continued to provide service to Wicked.**

94.     Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to ISPs of IP addresses where MEU confirmed infringement of copyright protected content.

95.     Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.

96.     MEU determines the proper abuse contact email address for the ISP assigned the IP addresses at issue from publicly available information from ARIN.

97.     Plaintiffs' agent sent the Notices to the abuse contact email address.

98.     MEU relied on publicly available information from ARIN to identify Voxility as the ISP for certain IP addresses at issue.

99.     Voxility is a member of ARIN and receives IP addresses from ARIN.

20-023I

100.    As a member of ARIN, Voxility is obligated to update the ARIN WHOIS records when it reassigns or reallocates IP addresses it is assigned by ARIN.

101.    Voxility reallocated or reassigned IP addresses it received from ARIN to its customer Wicked.

102.    Voxility failed to update the ARIN WHOIS records when it reassigned or reallocated the IP addresses it was assigned by ARIN to Wicked.

103.    Plaintiffs' agent sent hundreds of Notices to Voxility concerning IP addresses associated with confirmed infringing activity.

104.    For example, Plaintiffs' agent sent hundreds of Notices to Voxility concerning IP addresses   104.152.44.26;   104.152.44.18;   5.254.46.138;   104.152.45.2;   104.152.45.26; 172.94.59.251; 104.152.46.84; 5.254.46.130; 5.254.46.146; and 5.254.46.154.

105.    Plaintiffs' agent sent over 50 Notices to Voxility concerning IP address 104.152.44.26 in 2020.

106.    Voxility had allocated IP addresses including the aforementioned to its customer Wicked.

107.    Upon information and belief, other rightsholders had similar Notices sent to Voxility concerning infringing activity at IP addresses assigned to Voxility from ARIN that Voxility had allocated or reassigned to Wicked.

108.    Voxility continued to provide service to Wicked despite knowledge from at least the Notices that their customer Wicked was using the service to encourage Wicked customers to pirate copyright protected Works including Plaintiffs' exactly as promoted, encouraged and instructed by Wicked.

17

109.    Voxility even continued to provide service to Wicked despite receiving from counsel for Plaintiffs a first letter by certified mail on Sept. 28, 2020 informing Voxility that Plaintiffs' agent had sent hundreds of Notices to Voxility concerning IP addresses that were believed to have been assigned to Voxility's customer Wicked.  *See* Exhibit "2".

110.    Voxility continued to provide services to Wicked despite counsel for Plaintiffs explaining in said first letter how Wicked was using service obtained from Voxility to promote movie piracy, particularly promoting its VPN for use of Popcorn Time.

111.    Voxility continued to provide service to Wicked despite counsel for Plaintiffs explaining in said first letter how Wicked was using service obtained from Voxility to host the piracy app Popcorn Time.

112.    On October 28, 2020, Voxility's team manager Flavia Bandrabur informed Plaintiffs' counsel that Voxility had "…scheduled for termination the services of [Wicked] regarding the IP addresses mentioned in the letter, at the end of the month, specifically on 31st of October 2020."

113.    Despite Flavia Bandrabur's statement, Voxility continued to provide services for Wicked at least through January 31, 2021.

### E.  Wicked intentionally induces infringements of copyright protected Works, including Plaintiffs' Works and has knowledge of its customers infringements.

114.    Wicked actively promotes its VPN service for the purpose of movie piracy, including of infringing Plaintiffs' Works.

115.    Wicked actively promotes its VPN service as a tool to use the notorious movie piracy application Popcorn Time.

20-023I

116.    Wicked promotes its service under the brand name "Popcorn Time VPN" to be used to "avoid getting into trouble".



117.    Wicked blatantly entices and encourages customers to pirate by saying its VPN service can be used to "Be completely anonymous while torrenting on Popcorn Time."



19

118.    Wicked entered into an agreement with Doe in which Wicked's VPN service is promoted on the Popcorn Time website and the application itself includes a tool to easily install the VPN service.

119.    Wicked's subscribers such as DOES 1-100 use said movie piracy apps exactly as explained and encouraged to them by Wicked – to infringe copyright protected content while logged into Wicked's VPN service so they can conceal their illicit activities.

120.    Wicked actively promotes their VPN service as a tool to use the notorious movie piracy website YTS.



121.    The YTS website is known for distributing torrent files of copyright protected motion pictures including Plaintiffs'.

20-023I



122.   In stipulated judgments resolving lawsuits filed in the District of Hawaii, the operators of the YTS website, Senthil Segaran and Techmodo Limited, conceded that one or more third parties uploaded torrent files of motion pictures to the YTS website and that the YTS website provided links for distributing the torrent files. *See Venice PI, LLC et al. v. NGUYEN DINH MANH, et al.*, 1:19-cv-169-LEK-KJM, Doc. #77; *Wicked Nevada, LLC vs. Senthil Vijay Segaran*, 1:19-cv-413-SOM-KJM, Doc. #25; and *HB Productions, Inc. vs. Senthil Vijay Segaran*, 1:19-cv-389-ACK-KJM, Doc. #51.

123.   YTS is so notorious that the USTR placed a previous YTS website on a list of examples of Notorious Markets engaged in and facilitating substantial piracy in 2015. *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015, pg. 17, available at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.pdf [last accessed on March 5, 2021].

124.   Wicked promotes its VPN service as a tool to engage in massive copyright infringement to entice subscribers to purchase the VPN service.

125.    Based upon Wicked's encouragement that its service can be used to "safely" operate piracy apps such as Popcorn Time and visit torrent sites such as YTS, subscribers such as Defendants DOES 1-100 purchase Wicked, install piracy apps such as Popcorn Time on their devices and/or visit torrent sites to infringe copyright protected content including Plaintiffs' while using the VPN service.

126.    Wicked states without reservation that its VPN service is "P2P friend" and "You can Bittorrent at will."



127.    Defendants DOES 1-100 installed Popcorn Time on their devices so they could watch content in violation of copyright laws (i.e., "free movies").

128.    Defendants DOES 1-100 obtained an IP address from Wicked via the VPN service, and used the IP address to download and share copies of copyright protected content including Plaintiffs' by using Popcorn Time app or YTS website as instructed by Wicked while concealing their identities.

129.    Wicked knew or had reason to know that its subscribers used Popcorn Time exactly as promoted, resulting in direct infringement of the Copyrights of specific material including Plaintiffs' Works.

**F.  Wicked controls the conduct of its subscribers.**

130.    Wicked can terminate its subscribers at anytime.

131.    Upon information and belief, Wicked promptly terminated subscriber accounts when said subscribers failed to pay for the VPN service.

20-023I

132.    Wicked has the capability to log its subscribers' access to the VPN service but purposefully choose not to.



**G.  Wicked profits from the massive piracy conducted by their subscribers.**

133.    Wicked encourages its subscribers to use its VPN service for piracy.

134.    Wicked markets its VPN service as "Popcorn Time VPN".

135.    Wicked encourages Popcorn Time users to purchase its VPN service so that they can pirate copyright protected content "to avoid getting in trouble":



136.    Wicked and Doe have included a feature in the Popcorn Time app that allows users to automatically sign up for Wicked's "Popcorn Time VPN" while using the app:

20-023I



137.    Wicked provides hosting and support for Doe's Popcorn Time in exchange for Doe including this feature in the Popcorn Time app and promoting Wicked's VPN service to users of Popcorn Time.

138.    Doe states in the Frequently Asked Questions section of its website that its service "may be illegal in your country. Use at your own risk.":



139.    Doe also warns that users of its Popcorn Time will be seeding and distributing copies of copyright protected Works while they use Popcorn Time.



140.    Doe takes advantage of its users' fears by ensuring them that they can use Popcorn

Time "safely and anonymously" if they use Wicked's VPN service.



141.    Accordingly, Wicked profits worldwide from users of Popcorn Time who wish to

pirate copyright protected content including Plaintiffs' "safely and anonymously".

**H.  Voxility and Wicked do not have a safe harbor from liability.**

142.    As part of the DMCA, Congress created a safe harbor that limits the liability of

ISPs for copyright infringement when their involvement is limited to, among other things,

"transmitting, routing, or providing connections for, material through a system or network

controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this

safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented

... a policy that provides for the termination in appropriate circumstances of subscribers ... who are

repeat infringers." 17 U.S.C. § 512(i)(1)(A)

143.    Defendants Voxility and Wicked have failed to terminate any repeat infringers and/or

take any meaningful actions against their subscribers in response to these Notices consistent with a

reasonably implemented policy ("policy") for termination of subscribers and account holders of the

20-023I

service provider's system or network who are repeat infringers necessary to support a safe harbor from liability.

144.    Voxility's refusal to terminate the accounts of its subscribers Wicked or take any action is illustrative of Voxility's lack of any meaningful action consistent with the policy.

145.    After Plaintiffs sent Voxility the first letter describing infringements on September 28, 2020, MEU confirmed over 140 instances of distribution of Plaintiffs' Works thereafter from only the top five infringing IP addresses cited in Plaintiffs' first letter.

146.    Specifically, Plaintiffs described in detail that the subscriber of IP address 104.152.44.26 ("'26 IP address") has "a total of over 16,000 instances of infringement…including nearly 1000 instances just in 2020 alone." *See* Exhibit "2".

147.    Despite Voxility claiming it would terminate the services of the IP addresses listed in the first letter, the '26 address has an additional 47 instances of infringement since Plaintiffs' first letter, including 22 instances of infringement of the Work *Ava*.

148.    Upon information and belief, Defendant Voxility failed to forward any Notices it received from any rightsholders to its subscribers.

149.    Although Wicked purports to have a policy of terminating repeat infringers, Wicked also plainly states that it is "P2P friendly", and "We don't restrict any usage."  https://vpn.ht/buy-vpn:

20-023I



150.    Voxility's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

151.    Wicked's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

152.    Congress also created a safe harbor for service providers for information residing on systems at the direction of users.  *See* 17 U.S.C. § 512(c)(1).

153.    Voxility fails to qualify for this safe harbor because Voxility had knowledge that the material (i.e, Popcorn Time) or an activity using the material on its system or network is infringing.

154.    Voxility fails to qualify for this safe harbor because Voxility failed to act expeditiously to remove, or disable access to, the material such as Popcorn Time after obtaining knowledge from at least Plaintiffs' counsel that its subscriber Wicked was hosting and operating a piracy website and promoting its VPN service for the purposes of piracy.

155.    Voxility fails to qualify for this safe harbor because until December of 2020, Voxility failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

27

156.    Wicked also fails to qualify for this safe harbor because Wicked has failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2) including up to now.

## VI. FIRST CLAIM FOR RELIEF
### (Direct Copyright Infringement against Defendants Wicked, DOE and DOES 1-100)

157.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

158.    Plaintiffs are the copyright owners of the Works, each of which contains an original work of authorship.

159.    Defendants DOES 1-100 copied the constituent elements of these copyright-protected Works.

160.    By participating in the BitTorrent swarms with others, Defendants DOES 1-100 distributed at least a piece of each of the copyright protected Works to others.

161.    Wicked and Doe distribute said at least a piece for Defendants DOES 1-100 with knowledge that said at least a piece infringes Plaintiffs' rights.

162.    Plaintiffs did not authorize, permit, or provide consent to Defendants, Doe, DOES 1-100, or Wicked to copy, reproduce, distribute or display their Works.

163.    As a result of the foregoing, Defendants DOES 1-100 violated the Plaintiffs' exclusive right to reproduce the Works in copies, in violation of 17 U.S.C. §§ 106(1) and 501.

164.    As a result of the foregoing, Defendants Doe, DOES 1-100, and Wicked violated the Plaintiffs' exclusive rights to distribute copies of the Work in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

165.    Defendants Doe's, Wicked's, and DOES 1-100's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

20-023I

166. The Plaintiffs have suffered damages that were proximately caused by the Defendant Doe, Wicked, and DOES 1-100's copyright infringement including, but not limited to lost sales, price erosion, and a diminution of the value of its copyright.

## VII. SECOND CLAIM FOR RELIEF
### (Contributory Copyright Infringement by Intentional Inducement against Wicked and Doe)

167. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

168. Wicked and Doe intentionally induced the infringement of Plaintiffs' exclusive rights under the Copyright Act, including infringement of Plaintiffs' exclusive right to reproduce, publicly perform, and distribute copies of their Copyrighted Works.

169. As instructed and encouraged by the Wicked and Doe, subscribers such as Defendants DOES 1-100 purchase and install Wicked's VPN services to conceal their identities while engaging in movie piracy.

170. As instructed and encouraged by the Wicked and Doe, Wicked's subscribers such as Defendants DOES 1-100 install Doe's piracy app Popcorn Time on their devices while assigned IP addresses by Wicked's VPN services to conceal their identities.

171. Wicked's subscribers use Popcorn Time to connect to sources that publicly perform and/or distribute copies of Plaintiffs' Copyrighted Works while they use the VPN service.

172. Wicked and Doe induce direct infringement of Plaintiffs' Works by encouraging their subscribers to use movie piracy apps such as Popcorn Time that facilitate, enable, and create direct links between their customers and infringing sources, and by actively inducing, encouraging, and promoting the VPN service as a means to "safely" use movie piracy applications for blatant

20-023I

copyright infringement by assuring customers that their identification information will be concealed.

173.   Wicked and Doe's intentional inducement of the infringement of Plaintiffs' rights in their Copyrighted Works constitutes a separate and distinct act of infringement.

## VIII. THIRD CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon Material Contribution against all Defendants)

174.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

175.   By participating in the BitTorrent swarms with others, Defendants DOES 1-100 induced, caused, or materially contributed to the infringing conduct of Plaintiffs' copyright protected Works by others.

176.   Plaintiffs did not authorize, permit, or provide consent to the Defendants DOES 1-100 inducing, causing, or materially contributing to the infringing conduct of others.

177.   Defendants DOES 1-100 knew or should have known that the other BitTorrent users in a swarm with them were directly infringing the Plaintiffs' copyrighted Works by copying constituent elements of the registered Works that are original.  Indeed, Defendants DOES 1-100 directly participated in and therefore materially contributed to others' infringing activities.

178.   Through their conduct, Wicked and DOE knowingly and intentionally induced, enticed, persuaded, and caused their subscribers to infringe Plaintiffs' Copyrighted Works and continue to do so in violation of Plaintiffs' copyrights.

179.   Through its activities, Wicked and DOE knowingly and intentionally take steps that are substantially certain to result in direct infringement of Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

20-023I

180.    Despite Wicked and DOE's knowledge that their subscribers are using their VPN service and Popcorn Time to engage in widescale copyright infringements, Wicked and DOE have failed to take reasonable steps to minimize the infringing capabilities of their services.

181.    Not only have Wicked and DOE failed to take reasonable steps to minimize the infringing capabilities of their services, Wicked and DOE actively promote their VPN service and Popcorn Time as means to safely infringe Copyright protected Works, including Plaintiffs'.

182.    Despite Voxility's knowledge that its subscriber Wicked was using its service to host and support Popcorn Time to engage in widescale copyright infringement of Plaintiffs' Works and allow subscribers of its VPN service to engage in widescale copyright infringement of Plaintiffs' Works, Wicked failed to take reasonable steps to minimize the infringing capabilities of its service.

183.    Voxility is liable as a contributory copyright infringer for the infringing acts of Wicked. Voxility had actual and constructive knowledge of the infringing activity of its subscriber Wicked.  Voxility knowingly caused and otherwise materially contributed to these unauthorized reproductions and distributions of Plaintiffs' Works from Wicked.

184.    The Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

185.    By engaging in the contributory infringement alleged in this Complaint, the Defendants deprived not only the producers of the Works from income that could have been derived when the respective films were shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy. The Defendants' misconduct therefore offends public policy.

## VIII. FOURTH CLAIM FOR RELIEF
### (Vicarious Infringement against Voxility and Wicked)

186.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

187.    Voxility is vicariously liable for the infringing acts of its subscribers including Wicked.

188.    Voxility has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the direct and contributory infringements of Plaintiffs' copyrights by Wicked.

189.    Voxility refused to take any meaningful action to prevent the widespread infringement encouraged and performed by Wicked despite receiving hundreds of notices from Plaintiffs.

190.    Indeed, the ability of Wicked to obtain service including IP addresses from Voxility without having to identify itself as the assignee and abuse contact for these IP addresses allowed it to freely distribute copyright protected Works.

191.    The ability of Wicked to freely distribute copyright-protected Works and promote piracy on Voxility resources without penalty acts as a powerful draw for subscribers such as Wicked to use Voxility's service.

192.    Wicked is vicariously liable for the infringing acts of its subscribers.

193.    Wicked has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

194.    Wicked has refused to take any meaningful action to prevent the widespread infringement by its subscribers. Indeed, the ability of subscribers to use Wicked's VPN Service to

32

access Popcorn Time to infringe Plaintiffs' Works while concealing their activities acts as a powerful draw for users of Wicked's VPN Service, who use that service exactly as encouraged by Wicked to download and distribute copies of Plaintiffs' Works.

195.   Voxility and Wicked are therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' Works.

### IX. FIFTH CLAIM FOR RELIEF
### (Digital Millennium Copyright Act Violations against DOES 1-100)

196.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

197.   Defendants DOES 1-100 knowingly and with the intent to induce, enable, facilitate, and/or conceal infringement of the copyright protected Works distributed copyright management information ("CMI") that falsely included the wording "YTS" in violation of 17 U.S.C. § 1202(a)(2).

198.   Defendants DOES 1-100, without the authority of Plaintiffs or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include the wording "YTS" without the authority of the Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

199.   Defendants DOES 1-100, without the authority of Plaintiffs or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include the wording "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

20-023I

200.    Particularly, the Defendants DOES 1-100 knew that the CMI in the file names of the pieces of the Work had been altered to include the wording "YTS".

201.    Particularly, the Defendants DOES 1-100 distributed the file names that included CMI that had been altered to include the wording "YTS".

202.    Defendants DOES 1-100 knew that the wording "YTS" originated from notorious movie piracy website.

203.    Defendants DOES 1-100's acts constitute violations under the Digital Millennium Copyright Act ("DMCA violation"), 17 U.S.C. § 1202.

204.    Plaintiffs are entitled to an injunction to prevent Defendants DOES 1-100 from engaging in and/or contributing to further violations of 17 U.S.C. § 1202.

205.    Plaintiffs are entitled to recover from Defendants DOES 1-100  the actual damages suffered by Plaintiffs and any profits Defendants DOES 1-100 have obtained as a result of their wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

206.    Plaintiffs are entitled to elect to recover from Defendants DOES 1-100 statutory damages for their violations of 17 U.S.C. § 1202.

207.     Plaintiffs are further entitled to costs and reasonable attorneys' fees.

### X. SIXTH CLAIM FOR RELIEF
**(Secondary Liability for Digital Millennium Copyright Act Violations against Defendants Doe d/b/a popcorntime, Wicked and Voxility)**

208.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

209.    Through their conduct, Wicked and Doe knowingly and intentionally induced, enticed, persuaded, and caused their subscribers to commit DMCA violations.

210.    Through their conduct, Voxility knowingly caused its subscribers including Wicked to commit DMCA violations.

211.    Through their activities, Wicked and Doe knowingly and intentionally take or took steps that are substantially certain to result in their subscribers committing DMCA violations, and that have resulted in DMCA violations.

212.    Through their activities, Wicked and Doe knowingly and intentionally take or took steps that are substantially certain to result in their subscribers committing DMCA violations, and that have resulted in DMCA violations.

213.    Wicked encourage its subscribers to access torrent files for copying copyright-protected Works from notorious movie piracy websites such the YTS website.

214.    Wicked encourage its subscribers to use Doe's Popcorn Time for copying copyright-protected Works from notorious torrent websites such as the YTS website and sharing illicit file copies with altered CMI using the BitTorrent protocol.

215.    Despite Wicked and Doe's knowledge that their subscribers use the VPN service to commit DMCA violations, Wicked and Doe have failed to take reasonable steps to minimize the capabilities of the service to facilitate DMCA violations.

216.    Despite Voxility's knowledge that Wicked promoted its VPN service to commit DMCA violations and Wicked's users engaged in widespread DMCA violations, Voxility has failed to take reasonable steps to minimize the capabilities of its service to facilitate DMCA violations.

20-023I

217.    Wicked and Doe are secondarily liable for the DMCA violations of Wicked's subscribers. Wicked and Doe have actual and constructive knowledge of Wicked's subscribers' DMCA violations. Wicked knowingly caused and otherwise materially contributed to these DMCA violations.

218.    Voxility is secondarily liable for the DMCA violations of its subscribers, including Wicked.  Voxility has actual and constructive knowledge of Wicked's and Wicked's subscribers' DMCA violations.  Voxility knowingly caused and otherwise materially contributed to these DMCA violations by continuing to provide service to Wicked despite said knowledge.

219.    Wicked and Doe are vicariously liable for the DMCA violations of their subscribers. Wicked and Doe have the right and ability to supervise and control the DMCA violations that occur through the use of their service, and at all relevant times have derived a direct financial benefit from the DMCA violations complained of herein. Wicked has refused to take any meaningful action to prevent the widespread DMCA violations by its subscribers. Indeed, the ability of subscribers to access torrent websites such as the YTS website that Wicked itself promotes, and to obtain file copies of the Works with altered CMI and distribute said copies while concealing their activities, acts as a powerful draw for users of the VPN service, who use that service exactly as encouraged by Wicked to commit DMCA violations. Wicked is therefore vicariously liable for the DMCA violations.

220.    Plaintiffs are entitled to an injunction to prevent Defendants from contributing to further violations of 17 U.S.C. § 1202.

221.    Plaintiffs are entitled to recover from Defendants the actual damages suffered by Plaintiffs and any profits Defendants have obtained as a result of their wrongful acts that are not

20-023I

taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

222.    Plaintiffs are entitled to elect to recover from Defendants statutory damages for their violations of 17 U.S.C. § 1202.

223.     Plaintiffs are further entitled to costs and reasonable attorneys' fees.

## XI.  SEVENTH CLAIM FOR RELIEF
### (Application for Injunctive Relief based upon Contributory Infringement against Voxility and Wicked)

224.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

225.    Voxility and Wicked had actual knowledge of their users' infringements of Plaintiffs' exclusive rights under the Copyright Act by accessing notorious piracy websites that are of foreign origin. Indeed, Wicked promotes some of these notorious piracy websites.

226.    Despite having said actual knowledge, Voxility and Wicked continue to provide services to their users.

227.    Voxility and Wicked's actions of providing transmission, routing, or connections for said copies of the Works to their users are a direct and proximate cause of the infringements of Plaintiffs' Works.

228.    Voxility and Wicked had actual or constructive knowledge of infringement of Plaintiffs' exclusive rights under the Copyright Act by their users. Voxility and Wicked knowingly and materially contributed to such infringing activity.

229.    As a direct and proximate result of the infringement to which Voxility and Wicked knowingly and materially contribute and contributed, Plaintiffs are entitled to injunctive or other equitable relief as provided by 17 U.S.C. §§ 512(j)(1)(A) and (B) including but not limited to an

20-023I

order restraining Voxility and Wicked from providing access to infringing material or activity residing at movie piracy websites including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; (e) Fmovies; (f) Cimaclub; (g) Phinmoi; (h) Rapidgator; (i) Rutracker; (j) Torrentz2; (k) Uploaded; and (l) Popcorn Time and/or taking reasonable steps to block access to said movie piracy websites.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully requests that this Court:

(A) permanently enjoin Defendants DOES 1-100 from continuing to infringe the Plaintiffs' copyrighted Works;

(B) permanently enjoin Doe and Wicked from contributing to infringement of Plaintiffs' Works by promoting and encouraging their subscribers to use the VPN service as a means to conceal use of software application Popcorn Time and movie piracy websites such as the YTS website for pirating Plaintiffs' Works;

(C) order Voxility and Wicked to block subscribers from accessing notorious piracy websites of foreign origin that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government on the VPN service and any other networks under their control;

(D) order Voxility and Wicked to adopt a policy that provides for the prompt termination of subscribers that engage in repeat infringements of copyright protected Works;

(F) order Wicked to block ports 6881-6889 on all of the servers under their control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol;

(G) award the Plaintiffs actual damages and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum statutory damages of

$150,000/Work pursuant to 17 U.S.C.  § 504-(a) and (c) against (i) each of Defendant DOES 1-100; and (ii) against Doe d/b/a popcorntime.app, Voxility and Wicked Defendants jointly and severally;

(H) award the Plaintiffs their actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiff's election, for maximum statutory damages of $25,000 for DMCA violations pursuant to 17 U.S.C. § 1203(c) for violations of 17 U.S.C. § 1202 against (i) each of Defendant DOES 1-100; and (ii) against Doe d/b/a popcorntime.app, Voxility and Wicked Defendants jointly and severally;

(I) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 against Defendants; and

(J) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Reston, Virginia, March 5, 2021.

20-023I

Respectfully submitted,


  /s/ Timothy B. Hyland
Timothy B. Hyland
Virginia Bar No. 31163
Counsel for Plaintiffs
HYLAND LAW PLLC
1818 Library Street, Suite 500
Reston, VA 20190
Tel.: (703) 956-3566
Fax: (703) 935-0349
Email: thyland@hylandpllc.com


Kerry S. Culpepper, *pro hac vice forthcoming*
Hawaii Bar No. 9837
Counsel for Plaintiffs
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Tel.:  (808) 464-4047
kculpepper@culpepperip.com

20-023I