# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF VIRGINIA

MILLENNIUM FUNDING, INC., *et al.*,

    Plaintiffs,

    v.

WICKED TECHNOLOGY LIMITED d/b/a VPN.HT *et al.*,

    Defendants.

Case No.:  1:21-cv-00282-RDA-TCB

**DECLARATION OF JONATHAN YUNGER; EXHIBIT "A"**

## DECLARATION OF JONATHAN YUNGER

JONATHAN YUNGER, hereby declares under penalty of law that the following is true and correct:

1.    I am a resident of Los Angeles, California, over the age of 21, under no disability, and competent to testify to the matters contained in this declaration.

2.    I am currently employed as co-president of Millennium Media, Inc., which is the operations company for conducting day-to-day operations such as developing, casting and sales under the Millennium label (hereafter: "Millennium").

3.    Millennium and/or its affiliates form special purpose entities ("SPE") for developing and producing our motion pictures.  Specifically, Millennium and/or its affiliates formed the SPEs: Fallen Productions, Inc. for developing and producing the motion picture *Angel Has Fallen*; Hunter Killer Productions, Inc. for developing and producing the motion picture *Hunter Killer*; Automata Productions, Inc. for developing and producing the motion picture *Automata*; Bodyguard Productions, Inc. for developing and producing the motion picture *The*

*Hitman's Bodyguard*; Criminal Productions, Inc. for developing and producing the motion picture *Criminal*; HB Productions, Inc. for developing and producing the motion picture *Hellboy*; LHF Productions, Inc. for developing and producing the motion picture *London Has Fallen*; ME2 Productions, Inc. for developing and producing the motion picture *Mechanic: Resurrection*; Survivor Productions, Inc. for developing and producing the motion picture *Survivor*, and Rambo V Productions, Inc. for developing and producing the motion picture *Rambo V: Last Blood*.  Each of these SPEs (referred to here collectively as "Millennium Affiliates") is or was a corporation organized under the laws of Nevada.

4.     Fallen Productions, Inc., Automata Productions, Inc., Criminal Productions, Inc., Survivor Productions, Inc., and ME2 Productions Inc. were merged into their parent company Millennium Funding, Inc., a corporation organized under the laws of Nevada.

5.     I am an authorized representative of Hunter Killer Productions, Inc., Bodyguard Productions, Inc., LHF Productions, Inc., HB Productions, Inc., and Millennium Funding, Inc.

6.     The motion picture *Hunter Killer* was released in October of 2018. It is an action movie starring Gerald Butler, Gary Oldman, Common, Linda Cardellini, among others.

7.     The motion picture *The Hitman's Bodyguard* was released in 2017. It is an action movie starring Ryan Reynolds, Samuel L. Jackson, Salma Hayek and Gary Oldman, among others.

8.     The motion pictures *Angel Has Fallen* (2019), *London Has Fallen* (2016) and *Olympus Has Fallen* (2013) are a trilogy of action movies starring Gerald Butler, Aaron Eckhart and Morgan Freeman.

9.     The motion picture *Mechanic: Resurrection* is the sequel to the 2011 action hit, *The Mechanic*, and was released in 2016.  It is an action movie starring Jason Statham, Tommy Lee Jones and Jessica Alba, among others.

10.     Each of the motion pictures is easily discernible as a professional work as they were created using professional performers, directors, cinematographers, lighting technicians, set designers and editors and with professional-grade cameras, lighting and editing equipment. Each has significant value and has been created, produced and lawfully distributed at considerable expense.

11.     As a part of my duties for Millennium, I oversee the anti-piracy efforts of its affiliated SPEs and the effects of piracy on motion pictures produced by Millennium.

12.     On March of 2020 I testified before the Senate Judiciary Subcommittee on Intellectual Property on the subject on the effects of piracy on Millennium's motion pictures. I have attached to this declaration as Exhibit "A" a copy of my prepared remarks.

13.     I am aware of the activities of Defendants WICKED TECHNOLOGY LIMITED d/b/a VPN.HT, MOHAMED AMINE FAOUANI, and JOHN OR JANE DOE d/b/a POPCORNTIME.APP ("Defendants") in promoting and distributing the software application referred to as "Popcorn Time". I also have reviewed the Declarations of Joshua Lee and Stephen Bunting being filed contemporaneously with the First Amended Complaint.

14.     Defendants threaten a variety of serious and irreparable harms to the Millennium Affiliates if they are permitted to continue the infringing activities.

15.     Defendants deliberately induce the widespread, unlicensed streaming and distribution of motion pictures. This unlicensed use threatens the royalties we receive from our distribution agreements.

16.      Every time a user accesses an unauthorized stream or copy of the motion pictures, the Millennium Affiliates are not being compensated as they would be through authorized streams or copies of the motion pictures. By inducing such unauthorized access, Defendants' unlawful

conduct has caused, and will continue to cause the Millennium Affiliates this very direct and fundamental harm on a daily basis.

17.     Because Popcorn Time operates free from licensing restrictions, Defendants' distribution of Popcorn Time has the result of making the motion pictures available through unlicensed distribution channels, thereby interfering with and undermining our contractual commitment to and relationship with our distributor, and undermining our negotiating position for future agreements with authorized distributors.

18.     Based on my experience in the industry and understanding of illegal services against which the Millennium Affiliates and their distributors and licensees must compete, I believe the growth of illicit software applications such as Popcorn Time and sources of illegal conduct is fueled in part by the ease and convenience of the infringement that Defendants induce.

19.     I understand that Popcorn Time includes a WATCH IT NOW button as demonstrated by the screenshot below.  This button allows users to access illicit sources such as torrents that Defendants encourages their customers to utilize, provides those customers with the ability to quickly and easily locate an unauthorized source for all of the latest and most popular content.





20.     The Millennium Affiliates' motion pictures are available through a variety of

authorized U.S. distribution channels.  For example, the motion picture *Hunter Killer* is available for rental as of March 21, 2021 for purchase on YOUTUBE, AMAZON PRIME, VUDU and GOOGLE PLAY.



21.     As shown above, a Popcorn Time user who searched for the motion picture *Hunter Killer* can easily obtain and unauthorized copy for free.

22.     Popcorn Time also offer Defendants' customers a premium experience at no direct cost, contributing to a mistaken and incredibly harmful perception that content should be instantly and conveniently accessible for free. I am informed and believe that Popcorn Time does not appear to charge customers for accessing infringing copies.

23.     For the foregoing reasons, Defendants' Popcorn Time poses a significant threat to the entire legitimate market for home entertainment, and in particular, for the online distribution market.  This threatens the very foundation of the business of the Millennium Affiliates and the businesses of our distributor.

24.     The extent of the losses of the Millennium Affiliates arising from Defendants' ongoing, illegal competition regarding content that the Millennium Affiliates created or own, cannot be calculated with precision, nor are these damages likely to be recoverable from Defendants.

20-023I /20CV282

25.     Without the relief requested in this action, Defendants' infringing activities will continue unabated and Plaintiffs Millennium Funding, Inc., Hunter Killer Productions, Inc., Bodyguard Productions, Inc., HB Productions, Inc., LHF Productions, Inc., Rambo V Productions, Inc. and Bodyguard Production, Inc. will continue to suffer irreparable harm that no future damages award can mitigate.

DATED: Los Angeles, California, March __22__, 2021.

_____
Jonathan Yunger

20-023I /20CV282



16 March 2020

The Honorable Thom Tillis
Chairman
Senate Judiciary Subcommittee on Intellectual
Property
226 Dirksen Senate Office Building
Washington, DC 20002

The Honorable Chris Coons
Ranking Member
Senate Judiciary Subcommittee on
Intellectual Property
226 Dirksen Senate Office Building
Washington, DC 20002

Dear Chairman Tillis and Ranking Member Coons:

I would like to thank Chairman Tillis and Ranking Member Coons for leading these important hearings on the DMCA, 22 years after this vital legislation became law.

My name is Jonathan Yunger – I am Co-President of Millennium Media, one of the largest independent film production companies in the world. Our films include franchises like *The Expendables*, *Hellboy*, *Rambo*, the *"Has Fallen"* Series, and *The Hitman's Bodyguard*. We develop, produce, and self-finance our own content. Our box office has generated a total of over $1 billion. Our industry, with the other core copyright industries, together contribute $1.3 trillion annually to the U.S. GDP and employ over 5.7 million Americans. So, this is not just about entertainment, it is about a very important economic driver for this country and its citizens.

Piracy is an existential threat to our business and the livelihoods of all the individual creatives who work so hard to bring entertainment to audiences. Piracy competes unfairly with the legitimate marketplace and destroys the economic basis of creativity. For the past two decades, the plague of digital piracy has been stealing jobs from hardworking Americans.

The truth is that the battle against piracy has only intensified since the DMCA became law, with too little progress to show for it. At first, the tornado of piracy blew through the music industry – ultimately cutting that industry's revenues by half – but then it continued its destructive path through photography, film, television, journalism, and book publishing. Anything that could be distributed digitally online was stolen and monetized by criminals, facilitated by some of the world's wealthiest internet companies including Google, its now-sibling YouTube, and Facebook.

6423 Wilshire Blvd. Los Angeles, California 90048
Tel: (310) 388 - 6900  Fax: (310) 388 - 6901

**Exhibit "A"**

_Jonathan Yunger Prepared Remarks for 3.10.20 DMCA Hearing_
16 March 2020

A recent study commissioned by the U.S. Chamber of Commerce estimates that global video piracy costs the U.S. economy at least $29.2 billion in lost revenue _each year,_ and, as much as $71 billion annually. This is a staggering loss, made more so because of the many barriers to stopping it. Piracy is not only facilitated by global criminal operations who are immune to American law enforcement, but also by immense and reputable platforms based in the U.S. who enjoy broad statutory immunity for their actions, or inactions, under current law.

When the DMCA was written in 1998, Google was in beta. Facebook, Instagram, and YouTube did not exist.

As you know, at that time, there was a real concern that the threat of legal liability and _any_ form of restriction or regulation would constrain the then-fledgling internet industry. So, through Section 230 of the Communication Decency Act of 1996, internet intermediaries were given legal protection against being treated as publishers or speakers of third-party content. Courts doubled down on Congress' desire to protect the growth of a nascent internet at all costs, effectively granting these intermediaries wholesale immunity from liability for virtually any illegal actions of their users, excepting federal crimes and intellectual property violations.

Two years later, the DMCA stepped in where the CDA left off, providing internet intermediaries with "safe harbor" from copyright infringement liability stemming from their users' actions. On their face, the DMCA "safe harbors" are more constrained. They condition liability protection on the intermediaries taking affirmative steps aimed at combatting known infringement. But courts have again doubled down on the then-prevailing "hands-off" approach to the internet, in the process effectively eliminating the very safeguards that Congress intended to ensure effective protection for copyright online.

These laws were designed to promote growth, while also encouraging intermediaries to act responsibly in dealing with clearly abusive conduct. These laws have, without question, succeeded in fueling the unfettered growth of the internet. Unfortunately, they have done little to check the growth of piracy. They have also allowed companies like YouTube to leverage this immunity to build massive and profitable global businesses on the backs of copyright owners and have failed to encourage responsible behavior on the part of many intermediaries.

These safe harbors created a harmful assumption, and a reality, that copyright infringement was allowed on the internet unless and until a copyright owner found it and objected. As a result, the scale of criminal activity online is so immense, so pervasive and destructive, that current safe harbors, at least as applied to the biggest global digital platforms and intermediaries, cannot be seen as anything but a failure. And, this global criminal piracy ecosystem is directly competing with our films in markets around the world – to the detriment of Americans at home.

Under current U.S. law, Google has become one of the largest companies in the world in part by leveraging free infringing content into eyeballs and advertising revenue through its search results and its streaming service YouTube. Just for some context: The last time we did a comprehensive accounting of our films on YouTube, in June 2018, we found over 200 pirated versions of our titles on the platform. These films had

been viewed over _110 million_ times. In just that one month! And, by Google's own admission, it receives almost 900 million takedown notices from copyright holders each year.

With my partner, I run an independent production company. Our business is film. We finance our projects by entering into deals with international companies prior to production (called territorial pre-sales), giving them exclusive distribution rights in their home countries in exchange for providing a percentage of our production budgets.

Our partners invest in our films in the hope of monetizing their investments by showing our films in their home countries. In some countries, piracy has eliminated our partners' ability to invest. Even if our films are released on the same day in every country around the world, we still find that every one of these films becomes available online, for free, globally, within days… despite our best efforts at security. Why would any financial partner pay for movies that are being widely offered for free online, knowing full well that they would never be able to recoup their investments?

I would like to be able to tell you that America is on the front lines of this global fight against piracy, but, unfortunately, that is not true. Other countries around the world have taken the lead.

The first and most important tool being used abroad is no-fault injunctive relief aimed at blocking access to the market by known, adjudicated pirate sites, referred to by some as "site blocking." I realize that this idea may send some people on the Hill running from the room, particularly those who recall the painful and bitter fight when related legislation was last considered in the United States in 2011. At that time, opponents of copyright managed to convince everyone that such enforcement mechanisms would "break the internet" and "stifle free speech and innovation."

The problem was that these arguments were based in fearmongering and hyperbole, and there was no real basis for them. But most did not understand that at the time, including many people in our community. Break the internet? I did not want that. Back then, we all thought Silicon Valley was simply trying to make the world a better place. The tech industry and its allies tried to portray the creative community as a rich and greedy behemoth that was trying to take away people's free content and destroy their access to a safe and well-functioning internet.

Well, I think we all know who the rich and greedy industry behemoth is today, and there are plenty of questions about who can properly wave the guardian banner on behalf of internet users. In this David and Goliath scenario, the creative industry is obviously the David to the Big Tech Goliath. I just hope that this time, the story works out the way it did for David.

Let's focus on the truth about site-blocking. There are currently at least 34 countries with active site-blocking laws in place around the world, including our Western allies Australia, Canada, and the United Kingdom. In the European Union alone, there are at least 17 member states that offer website blocking as a means of ensuring meaningful online enforcement. As of April 2018, it is estimated that over 1,800 websites and over 5,300 domains used by such sites have been blocked in the European Union (mainly in the United Kingdom, Denmark, Italy, and Portugal).

The effect of site-blocking has been studied extensively in these countries. It is entirely clear that it is a highly successful tool to fight piracy. In the United Kingdom, according to a Carnegie Mellon study, there was an almost 25% increase in traffic to legitimate sites by the heaviest users of the blocked sites.[1] And, in Australia, a recent report found that piracy traffic has decreased by 25% in the wake of their site-blocking efforts. These trends further prove that consumers happily frequent legitimate online marketplaces when the option of pirate sources becomes less attractive or available. In another Carnegie Mellon study, users purchased legitimately 94% of the time when given search results that did not include pirate websites.[2]

Since the first website blocking order went into place in May 2010, notorious piracy site ThePirateBay has been blocked in at least 19 countries. Isohunt was blocked in 10 countries and KickAssTorrents was blocked in 11 countries. Though the latter two were eventually shut down following successful civil and criminal actions, The PirateBay, along with tens of thousands of other piracy websites, remain available to all Americans.

And the implementation of site-blocking by courts and agencies in these countries has not led to the breaking of the internet.

And, in those countries, I have seen first-hand that the legitimate marketplace is now healthier. My partners are more willing to pay better license fees because they know that the risk of digital piracy has been reduced. In the United Kingdom, revenues have definitively gone up since site-blocking went into effect. I would like to see America equally committed to creating a healthier legitimate film and television marketplace.

It is very rare for a film to be released online illegally before the theatrical release. And, at Millennium Media, we have some of the best film security in the world, security that costs us a lot of money. But in 2014, our film, *Expendables 3*, was stolen by an employee of one of our vendors and released online a month before it could open in theaters. By opening day, the movie had been downloaded 60 million times. It was calculated that we lost about $250 million in box office revenue.

As I noted earlier, our company depends on territorial pre-sales like that one to Russia to make our movies. We spent about $90 million to make *Expendables 3,* much of it raised from these territorial pre-sales around the world. At that time, one of our Russian distributors had paid $6 million for the right to release the film in Russian theaters. Because the piracy pre-release destroyed the value of the film in Russia, they went out of business.

The pirate was eventually caught because of a law enforcement organization in the United Kingdom called PIPCU, the Police Intellectual Property Crime Unit, funded by the UK government. Increased resources and directions for the Department of Justice and Homeland Security are a part of any solution to piracy.

---

[1] The Effect of Piracy Website Blocking on Consumer Behavior, Carnegie Mellon University, November 2015
[2] Do Search Engines Influence Media Piracy? Evidence from a Randomized Field Study, Carnegie Mellon University, September 2014

Why wouldn't the U.S. be a leader in preventing access to our market by sites that are clearly illegal, taking money out of the hands of American workers and industry alike? Given that we now have years of experience around the world and have seen different approaches, it is time to evaluate what works and what does not – to protect the interests of American creatives, the American economy, and the American public. Please do not shy away from this important task. We must again be the gold standard of copyright protections for all other countries around the world.

Silicon Valley's campaign against copyright is never-ending. Google spent more money lobbying the federal government last year than any other American company – fighting, among other things, to erode copyright protections in the U.S. and around the world. Today, Google makes more money than all of the major movie studios and television networks combined. They do not need weaker laws to allow the profitable piracy of our creative work on their platforms. They just need the status quo. I do not understand why Google and other Big Tech companies would continue to justify their own role, and that of pirates, in destroying the value of American creativity. They need to stop.

We need Congress' help to lift the members of the creative community out of their indentured service to these internet giants and the global criminals they help, and once again give them control over their work and how it is distributed online. The DMCA created a framework that was meant to encourage meaningful cooperation and effective protection against online piracy. But, as we sit here today, it is not producing either one. Internet platforms have failed to live up their side of the bargain, enabled by court decisions eroding the DMCA's core protections in favor of a hands-off approach to the internet. Meanwhile, everyday working creatives and consumers bear the brunt of those decisions. Congress needs to do what it can to ensure that the meaningful protection it intended to achieve through the DMCA does not remain illusory.

Silicon Valley likes to tell you that they already have solutions to piracy, using filtering technology or content protection tools to catch copyright infringement. As some of you may know, I traveled to DC in December for a Senate roundtable with Google and YouTube executives to discuss why so many of us in the creative community are denied access to this filtering technology. My question is: Why do I have to come to DC to beg for the ability to protect myself with tools that already exist? After two months of back and forth, my company has now been given access to a simpler version of YouTube's filtering technology. But my question remains: Why did I have to make that trip? And what about the thousands of other copyright holders, my peers, who cannot make this trip?

Full-length piracy of our films has nothing to do with free speech. Criminal operations running piracy sites are not engaged in legitimate "free speech" when they steal our movies. I could argue that the only thing "broken" about the internet is the lack of law and order that has created the cesspool with which we are all contending today. I ask that you look internationally for examples of what has been successful in the efforts to curb copyright infringement and work here at home to improve our own efforts to ensure a robust and equitable 21st century American copyright framework.

I have a movie premiering in the next month about the Battle of Kamdesh in Afghanistan called *The Outpost* – it's the story of 53 soldiers who were ambushed by over 400 Taliban, and won. They were the most decorated unit in the Afghanistan War. It took me seven years to get it made.

*Jonathan Yunger Prepared Remarks for 3.10.20 DMCA Hearing*                    6
16 March 2020


Some of the proceeds from this film were intended to help our veterans. But, I know now, seven years later, that as soon as the film is released online, hundreds of thousands, if not millions, of people will probably stream it illegally in the United States. I do not anticipate that there will be enough profits to share because of piracy.  Please tell me how I explain to SFC Jonathan Hill, who fought in the battle and who I have promised to help fund Carry The Load (an organization dedicated to helping stop veteran suicide), that there are not enough profits on this film to deliver on my promise.

How am I supposed to tell America's sons and daughters that we cannot help them? We need to win this fight.

Thank you for inviting me to participate in this Hearing, and I look forward to your questions.


Sincerely,


Jonathan Yunger
Co-President